Slip Op. 22-3

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| POSCO,<br><br>              Plaintiff,<br><br>NUCOR CORPORATION,<br><br>              Consolidated Plaintiff,<br><br>ARCELORMITTAL USA LLC and SSAB ENTERPRISES LLC,<br><br>              Plaintiff-Intervenors,<br><br>       v.<br><br>UNITED STATES,<br><br>              Defendant,<br><br>       and<br><br>SSAB ENTERPRISES LLC, NUCOR CORPORATION, ARCELORMITTAL USA LLC and POSCO,<br><br>              Defendant-Intervenors. | Before: Gary S. Katzmann, Judge<br>Consol. Court No. 17-00137 |

### OPINION

[The court sustains Commerce's Remand Results.]

Dated:  January 13, 2022

Brady W. Mills, Ragan W. Updegraff, Donald B. Cameron, Julie C. Mendoza, R. Will Planert, Mary S. Hodgins, Eugene Degnan, and Sarah S. Sprinkle, Morris, Manning & Martin LLP, of Washington, D.C., for Plaintiff and Defendant-Intervenor POSCO.

Adam H. Price, Christopher Weld and Adam M. Teslik, Wiley Rein, LLP, of Washington, D.C., for Consolidated Plaintiff and Defendant-Intervenor Nucor Corporation.

Kelly A. Krystyniak, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States.  With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and

Tara K. Hogan, Assistant Director.  Of counsel on the brief was Rezza Karamloo, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Katzmann, Judge:  The court returns to a challenge to the U.S. Department of Commerce's ("Commerce") determination that Korean producers of certain carbon and alloy steel cut-to-length plate ("CTL plate") did not receive a countervailable benefit through the provision of electricity for less than adequate remuneration ("LTAR").  Before the court is Commerce's Final Results of Redetermination Pursuant to Court Remand (Dep't Commerce July 6, 2021), ECF No. 118 ("Second Remand Results"), which were ordered following the decision of the United States Court of Appeals for the Federal Circuit in POSCO v. United States, 977 F.3d 1369 (Fed. Cir. 2020) ("POSCO IV") so that Commerce could amend its CVD determination to comply with that decision.  See generally, Mandate, Feb. 18, 2021, ECF No. 111.  On remand, Commerce "reexamined its benefit analysis in the provision of electricity for LTAR" and concluded that (1) the Korean Electricity Corporation ("KEPCO") did not provide electricity for LTAR, and (2) the electricity prices established by the Korean Power Exchange ("KPX") do not constitute a countervailable benefit.  Consolidated Plaintiff Nucor Corporation ("Nucor") challenges Commerce's Second Remand Results on the basis that they do not comply with POSCO IV's holdings that (1) a preferential-rate analysis is not a legally permissible method for the assessment of LTAR, and (2) Commerce's failure to investigate KPX's influence on KEPCO's pricing constituted a failure to support its final determination with substantial evidence.  Nucor's Cmts. in Opp. to Final Results of Redetermination Pursuant to Ct. Remand, Aug. 6, 2021, ECF No. 121 ("Nucor's Br.").  Defendant the United States ("Government") requests that the court sustain Commerce's Second Remand Results.  Def.'s Resp. to Cmts. on Final Results of Redetermination,

Sept. 7, 2021, ECF No. 123 ("Def.'s Br.").  Upon consideration of the arguments presented by the

parties, the court now sustains Commerce's Second Remand Results.

## BACKGROUND

The court set out the relevant legal and factual background of the proceedings in further

detail in its previous opinions, POSCO v. United States, 42 CIT __, 353 F. Supp. 3d 1357 (2018)

("POSCO I"); POSCO v. United States, 43 CIT __, 382 F. Supp. 3d 1346 (2019) ("POSCO II");

and POSCO v. United States, 43 CIT __, 415 F. Supp. 3d 1233 (2019) ("POSCO III").  Information

relevant to the instant opinion is set forth below.

In 2016, Commerce initiated a countervailing duty investigation of certain CTL plate from

Korea, with a period of investigation ("POI") of January 1, 2015 through December 31,

2015.  Certain Carbon and Alloy Steel Cut-to-Length Plate from Brazil, the People's Republic of

China, and the Republic of Korea: Initiation of Countervailing Duty Investigations, 81 Fed. Reg.

27,098 (Dep't Commerce May 5, 2016), P.R. 59.  POSCO was selected as a mandatory

respondent.[1]  Respondent Selection Mem. (Dep't Commerce May 31, 2016), P.R. 102.  On April

---

[1] In CVD investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f-1(e)(2), which provides:

If the administering authority determines that it is not practicable to determine individual countervailable subsidy rates under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may—

(A)    determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting its examination to—

    (i)    a sample of exporters or producers that the administering authority determines is statistically valid based on the information available to the administering authority at the time of selection, or

    (ii)    exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that the administering authority determines can be reasonably examined; or

(B)    determine a single country-wide subsidy rate to be applied to all exporters and producers.

4, 2017, Commerce issued a final affirmative countervailing duty ("CVD") determination, imposing a duty rate of 4.31% on POSCO.  <u>Certain Carbon and Alloy Steel Cut-To-Length Plate From the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination</u>, 82 Fed. Reg. 16,341 (Dep't Commerce Apr. 4, 2017), P.R. 505 ("<u>Final Determination</u>") and accompanying Issues and Decision Mem. (Mar. 29, 2017), P.R. 497 ("<u>IDM</u>").

POSCO challenged several aspects of Commerce's <u>Final Determination</u>, including the countervailability of research and development grants received by POSCO M-Tech and Commerce's application of adverse facts available ("AFA") to POSCO Chemtech and to Hyundai.  <u>POSCO III</u>, 415 F. Supp. 3d at 1235–36.  Nucor also challenged Commerce's determination, arguing that Commerce wrongly determined that POSCO did not benefit from subsidized electricity.  <u>POSCO I</u>, 353 F. Supp. 3d at 1363.

In <u>POSCO I</u>, the court upheld Commerce's application of AFA to POSCO M-Tech's unreported additional government subsidies, but remanded for reconsideration the question of whether POSCO M-Tech's research and development grants constituted a countervailable subsidy. <u>Id.</u> at 1374–76, 1383.  POSCO then moved for the court to reconsider its affirmance of (1) Commerce's application of a 1.05% AFA rate to POSCO M-Tech for unreported government subsidies received by Ricco Metal and Nine-Digit, both companies acquired by POSCO M-Tech; and (2) Commerce's application of a 1.05% AFA rate to Hyundai and attribution of this rate to POSCO.  Mot. of Pl. POSCO for Reh'g. and Recons. at 2–3, Dec. 21, 2018, ECF No. 82.  In <u>POSCO II</u>, responding to the motion for reconsideration, the court concluded that "Commerce did

---

The individual countervailable subsidy rates determined under subparagraph (A) shall be used to determine the all-others rate under section 1671d(c)(5) of this title.

not provide any additional explanation of how it determined that there was no identical program [to the research & development grants] before moving to the second step of its AFA methodology -- using the rate in another investigation -- and thus did not make the requisite factual findings to address POSCO's contention that the [Industrial Technology Innovation Promotion Act] grant was an identical program in the proceeding." <u>POSCO II</u>, 382 F. Supp. 3d at 1349. The court accordingly further remanded to Commerce the issue of whether, under the first step of the AFA methodology, a program identical to the assistance received by Ricco Metal and Nine-Digit existed. <u>Id.</u> The court declined to reconsider Commerce's application of AFA to Hyundai and the attribution of that rate to POSCO. <u>Id.</u> at 1346.

Commerce filed its first redetermination results with the court in July of 2019. <u>Final Results of Redetermination Pursuant to Court Remand</u> (Dep't Commerce July 1, 2019), ECF No. 97 ("<u>First Remand Results</u>"). In the <u>First Remand Results</u>, Commerce concluded that (1) POSCO M-Tech's research and development grants (as received by Ricco Metal and Nine-Digit) were countervailable; (2) the use of the highest AFA rate was appropriate in light of POSCO's failure to cooperate; (3) the initial 1.64% AFA rate assigned to Chemtech should be reduced to 1.05%; and (4) no program identical to the research & development grants existed. The court, after consideration of the <u>First Remand Results</u> and comments by the parties, sustained Commerce's determination on remand. <u>POSCO III</u>, 415 F. Supp. 3d at 1240.

On January 7, 2020, Nucor appealed the court's decision in <u>POSCO III</u> to the Federal Circuit. The appeal was subsequently stayed pending resolution of a related appeal, <u>POSCO v. United States</u> No. 19-1213. Order Granting Mot. to Stay, POSCO v. United States, No. 20-1357 (Fed. Cir. Feb. 27, 2020), ECF No. 16. On October 15, 2020, the Federal Circuit issued its decision in the related appeal, <u>POSCO IV</u>, in which it determined that the application of a preferential-rate

standard is insufficient to establish adequacy of remuneration (and is thus contrary to law), and

that Commerce's failure to address "the role of KPX in the Korean electricity market" in the

investigation on appeal rendered its final determination unsupported by substantial evidence.

POSCO IV, 977 F.3d at 1378.  This court's decision in POSCO III was accordingly vacated and

remanded for further proceedings.  Order Granting Mot. to Terminate Appeal, POSCO v. United

States, No. 20-1357 (Fed. Cir. Feb. 18, 2021), ECF No. 19.

 This court subsequently ordered the filing of remand results consistent with POSCO IV by

June 23, 2021.  Scheduling Order, Mar. 16, 2021, ECF No. 114.  On July 6, 2021, after an extension

of time, Commerce filed its Second Remand Results.  Nucor filed comments in opposition to the

Second Remand Results on August 6, 2021.  Nucor's Br.  The Government then filed a reply to

Nucor's comments in opposition on September 7, 2021.  Def.'s Br.

## JURISDICTION AND STANDARD OF REVIEW

 The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c).  The standard

of review in this action is set forth in 19 U.S.C. § 1516a(b)(1)(B)(i): "[t]he court shall hold

unlawful any determination, finding or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol.

Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).  "[T]he possibility of drawing two inconsistent

conclusions from the evidence does not prevent an administrative agency's finding from being

supported by substantial evidence."  Mid Continent Steel & Wire, Inc. v. United States, 940 F.3d

662 (2019) (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).  Where Congress

has entrusted an agency to administer a statute that demands inherently fact-intensive inquiries,

the agency's conclusions fail only if the record contains evidence "so compelling that no

reasonable factfinder" could reach the same conclusion.  I.N.S. v. Elias-Zacarias, 502 U.S. 478, 483–84 (1992).  The court also reviews the determinations pursuant to remand "for compliance with the . . .  remand order."  See Beijing Tianhai Indus. Co. v. United States, 39 CIT __, __, 106 F. Supp. 3d 1342, 1346 (2015) (citations omitted).

## DISCUSSION

In POSCO IV, the Federal Circuit addressed two challenges by Nucor: "first, whether Commerce's reliance on a preferential-rate standard to determine whether a conferred benefit is a countervailable subsidy is contrary to law and, second, whether Commerce's determination that the Government of Korea did not confer a benefit to Korean producers of cold-rolled steel flat products for less than adequate remuneration is contrary to law and unsupported by substantial evidence."  977 F.3d at 1371.  The court concluded that the application of a preferential-rate standard is contrary to law, and that Commerce's failure to analyze KPX's costs, as well as KEPCO's costs, rendered its final determination that electricity was not provided for LTAR unsupported by substantial evidence.  Id. at 1376, 1378.  Nucor now contends that Commerce failed to comply with the court's holding in POSCO IV, arguing that the Second Remand Results do not apply the statutorily required adequate remuneration standard and that Commerce has again neglected to adequately consider KPX's generation costs in its LTAR analysis.[2]  Nucor's Br. at 6, 9.  Nucor further argues that Commerce erred by failing to consider KEPCO's cost data for the POI, and instead relying on pre-POI data.  Id. at 17.  The court rejects Nucor's arguments and sustains the Second Remand Results.

---

[2] POSCO does not challenge Commerce's Second Remand Results.

## I.    Commerce's LTAR Analysis on Remand is in Accordance with Law

With respect to Commerce's determination that electricity was not provided to POSCO for LTAR, the Federal Circuit concluded in <u>POSCO IV</u> that the appeal of Commerce's investigation of CTL plate from Korea involves "essentially the same issues" as considered by the court in <u>Nucor Corporation v. United States</u>, 927 F.3d 1243 (Fed. Cir. 2019).  More specifically, the Federal Circuit concluded that "[a]s in <u>Nucor</u>, Commerce's use of the pre-[Uruguay Round] preferential-rates standard . . . is inconsistent with the adequate-remuneration standard under [19 U.S.C.] § 1677(5)(E)(iv).  Commerce cannot rely on price discrimination to the exclusion of a thorough evaluation of fair-market principles to determine whether a recipient is receiving an unlawful benefit."  <u>POSCO IV</u>, 977 F.3d at 1376 (citing <u>Nucor</u>, 927 F.3d at 1251).  In other words, Commerce must determine whether a benefit exists under the statute without "depend[ing] on [a] finding that the producer is being discriminatorily favored compared to others in the exporting country."  <u>Nucor</u>, 927 F.3d at 1251.

In the <u>Second Remand Results</u>, Commerce first argues that "the passage referenced by the [court] in finding that Commerce relied on a preferential rate standard was, in fact, not the basis for Commerce's adequacy of remuneration analysis," and indeed that Commerce relied on "the fact that KEPCO fully covered its costs in the industrial rates charged to the respondent steel companies" in determining that electricity was not provided for LTAR.  <u>Second Remand Results</u> at 10.  Commerce states that it did not consider "the price charged to other customers in Korea," as it would when conducting a preferential-rate analysis, but rather "whether the price charged to the respondents was consistent with market principles and prevailing market conditions in Korea." <u>Id.</u> at 13.

Commerce goes on to state that, on remand, it "continue[s] to find that KEPCO did not provide electricity for LTAR under [19 U.S.C. § 771(5)(E)(iv)]." Id. at 16.  To determine that electricity was not provided for LTAR, Commerce explains, it assessed KEPCO's "industrial tariff classifications," which are themselves calculated by reference to "demand[, . . .] voltage," "electricity load level, the usage pattern of electricity, and the volume of electricity consumed" as well as "the number of consumers." Id. at 14.  As prevailing market conditions are themselves defined by "price, quality, availability, marketability, transportation and other conditions of purchase or sale," 19 U.S.C. § 1677(5)(E)(iv), Commerce assessed whether electricity was provided for LTAR under the prevailing market conditions by determining whether the "respondent steel companies [were] charged the appropriate tariff rate" under KEPCO's industrial tariff classifications. Id.  Thus, on remand, Commerce adopts the conclusions reached in its Final Determination and First Remand Results with respect to the provision of electricity for LTAR, but offers additional explanation of how its tariff classification analysis was consistent with the statutory LTAR analysis required under 19 U.S.C. § 1677(5)(E)(iv) and by the Federal Circuit in Nucor and POSCO IV. Id. at 15–16.

Nucor argues that, contrary to Commerce's assertions, the Second Remand Results "articulate, but do not properly apply, a standard that would comply with the statutory adequate remuneration standard." Nucor's Br. at 4.  Rather, Nucor claims, Commerce applies the rule from Pure Magnesium and Alloy Magnesium from Canada, 57 Fed. Reg. 30,946, 30,954 (Dep't Commerce July 13, 1992), where Commerce determined the existence of preferential rates based exclusively on whether "similarly situated users [of electricity] pa[id] the same rate," rather than by conducting the required LTAR analysis. Id. at 6.  Nucor argues that Commerce applied a preferentiality analysis in its Final Determination, and continues to do so on remand by failing to

"examine the prices actually paid by the respondents at all." Id. at 9. Accordingly, Nucor concludes that Commerce failed to comply with the Federal Circuit's holdings in POSCO IV. Id.

Nucor mischaracterizes Commerce's analysis. As the Government explains in its reply comments, "KEPCO's standard pricing mechanism, which serves as the basis for its tariff schedule and classifications, is based on KEPCO's costs." Def.'s Br. at 7 (citing Second Remand Results at 12). Rather than simply analyzing whether KEPCO's tariff rates were consistently applied, Commerce in its analysis first "examined whether the tariff charged . . . covers 'cost of production' plus a 'profitable return on the investment'" for KEPCO; and then examined "whether the tariff actually charged . . . is in accordance with the tariff established." Id. (citing Second Remand Results at 13–15; 30–31). In other words, Commerce determined on remand first that KEPCO's tariff classifications "were developed in accordance with market principles as described in [19 U.S.C.] § 1677(5)(E)(iv)," and then that the prices charged to industrial consumers, including respondents, were "in accordance with the tariff classifications . . . as established by KEPCO." Id. at 9. By arguing that Commerce relied on a preferentiality standard, Nucor fails to account for the first half of Commerce's analysis, wherein Commerce determined that "the electricity tariffs . . . cover[] cost plus a return," and addresses only Commerce's conclusion that "the respondent [was] treated no differently" than comparable consumers. Second Remand Results at 30.

The court agrees with Nucor that, if Commerce had based its analysis exclusively on the consistent application of KEPCO's standard pricing mechanism, Commerce's determination on remand would fail to comply with POSCO IV and Nucor. However, neither POSCO IV nor Nucor requires that Commerce never consider the presence or absence of preferential pricing. Rather, Nucor notes that "discrimination in the price-lowering direction might be some evidence that a rate fails to be adequately remunerative," even though "the absence of discrimination . . . logically

does not itself establish that the government authority is receiving an adequately remunerative price." 927 F.3d at 1252.  It is simply that "Commerce cannot rely on price discrimination to the exclusion of a thorough evaluation of fair-market principles to determine whether a recipient is receiving an unlawful benefit." POSCO IV, 977 F.3d at 1376 (citing Nucor, 927 F.3d at 1251) (emphasis added).

Here, Commerce did not rely only on the presence of absence of discrimination to conclude that KEPCO did not provide electricity to respondents for LTAR.  Rather, it analyzed both the relationship between KEPCO's standard pricing mechanism and its costs of production of electricity, IDM at 32–33 (citations omitted), and the presence or absence of preferential pricing, IDM at 29–30.  In so doing, Commerce ultimately assessed whether "the tariff charged to the respondent" failed to "cover 'cost of production' plus 'a profitable return on the investment'" as set forth in KEPCO's detailed pricing methodology, which itself incorporated the fair-market factors enumerated in 19 U.S.C. § (5)(E)(iv).  Second Remand Results at 30.  Accordingly, Commerce's analysis did not violate the requirements of Nucor and POSCO IV by failing to incorporate an analysis of "fair-market principles" and thus of the adequacy of remuneration.  See POSCO IV, 877 F.3d at 1376.

Because Commerce's Second Remand Results comply with the requirements of 19 U.S.C. § 1677(5)(E)(iv), Nucor, and POSCO IV, the court concludes that Commerce's LTAR analysis was in accordance with law.  The court next considers whether the LTAR analysis is supported by substantial evidence on the record.

## II.    Commerce's Cost Recovery Analysis is Supported by Substantial Evidence and In Accordance with Law.

Nucor makes two arguments with respect to Commerce's cost recovery analysis: first, that the analysis impermissibly relies on data from outside the POI, and second, that Commerce fails

to comply with the Federal Circuit's mandate to consider not only KEPCO's costs but also "KPX's impact on the Korean electricity market."  POSCO IV, 977 F.3d at 1376.  The court addresses these contentions in turn.

### A.      Commerce Reasonably Relied on Cost Recovery Data Outside the POI

In both the Final Determination and the Second Remand Results, Commerce relied upon KEPCO's 2014 cost data and 2015 overall electricity cost data to establish that the industrial classification yielded both cost recovery and a rate of return.  Second Remand Results at 33–34. Commerce acknowledged on remand that KEPCO's 2014 cost data was not included in the record, but explained that it ultimately relied on a combination of the 2014 cost data, KEPCO's U.S. Securities and Exchange Commission Form 20-F for the POI, and the 2014 overall electricity cost data to assess KEPCO's cost recovery during the POI.  Using the available data, Commerce concluded that KEPCO's industrial tariff classifications "would have recovered costs and [yielded] a rate of return during the period of investigation."  Def.'s Br. at 12 (citing Second Remand Results at 35–36).

Nucor argues that Commerce's determination, based on the 2014 KEPCO cost data and Form 20-F, was arbitrary.  Nucor's Br. at 16 (quoting IDM at 35–36).  Specifically, Nucor contends that Commerce has repeatedly rejected "arguments based on information in a pre-POI Korean government analysis of industrial electricity rates" and notes that in the instant investigation, Commerce has also rejected record information because "it concerned data outside the period of investigation" which "alone negated its usability."  Id. at 17 (citing Def.'s Resp. Br. to Mot. for J. on Agency Record, Mar. 23, 2018, ECF No. 52).  Because Commerce fails to consistently reject as "fatally flawed" information predating the POI, Nucor concludes that Commerce's Second Remand Results are not supported by substantial evidence.  Id. at 18.

Nucor again mischaracterizes Commerce's analysis.  First, as the Government notes, the investigations cited by Nucor did not involve a decision by Commerce to reject non-POI data where POI data was similarly unavailable on the record.  Def.'s Br. at 13; <u>see also</u> Issues and Decision Mem. accompanying <u>Certain Corrosion-Resistant Steel Products from the Republic of Korea</u>, 81 Fed. Reg. 35,310 (Dep't Commerce Jun 2, 2016) at 24 ("[O]ur analysis was based upon KEPCO's industrial tariffs that were in effect during [the POI]") ("Corrosion-Resistant Steel IDM"); Issues and Decision Mem. accompanying <u>Certain Cold-Rolled Steel Flat Products from the Republic of Korea</u>, 81 Fed. Reg. 49,943 (Dep't Commerce July 29, 2016) at 50–51 (same) ("Cold-Rolled Steel IDM"); Issues and Decision Mem. accompanying <u>Certain Hot-Rolled Steel Flat Products from the Republic of Korea</u>, 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016) at 50 (same) ("Hot-Rolled Steel IDM").  Second, in both the instant case and the prior investigations cited by Nucor, the data rejected by Commerce as "outside the period of investigation" and thus unusable was a National Assembly Report which was issued in 2012 and does not reflect the three KEPCO tariff increases which occurred between 2012 and 2014.  IDM at 33; Corrosion-Resistant Steel IDM at 24; Cold-Rolled Steel IDM at 51; Hot-Rolled Steel IDM at 50.  It is therefore not the date of the rejected data that rendered it unusable, but rather the fact that the date necessarily indicated that it would not accurately reflect KEPCO cost recovery data during the POI.

With respect to Commerce's reliance on the 2014 KEPCO cost data, the 2015 overall cost data, and KEPCO's Form 20-F for the POI, the court concludes that Commerce's cost recovery analysis was supported by substantial evidence.  As noted above, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consol. Edison</u>, 305 U.S. at 229.  Furthermore, while the explanation Commerce provides for its

conclusion need not "be perfect, the path of Commerce's decision must be reasonably discernable

to a reviewing court."   NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir.

2009).   Here, Commerce has satisfied both standards by providing ample explanation for its

reliance on the 2014 KEPCO cost data in combination with the record data reflecting the POI:

"[t]he record information establishes that no changes were made to [GOK's] methodology as it

would be applied to calculate the 2015 cost data," and that "no factors [arose] that would impact

the industrial [tariff] classification[s]."   Second Remand Results at 35–36; see generally id. at 33–

36 (detailing Commerce's use of the Form 20-F data and 2015 overall cost data to confirm and

assess the 2014 KEPCO cost data).   Nor does Nucor identify any record evidence "so compelling

that no reasonable factfinder" could accept Commerce's analysis.   Elias-Zacarias, 502 U.S. at 483–

84.   The court concludes that Commerce's reliance on data from outside the POI was reasonable,

and that its cost recovery analysis was supported by substantial evidence.

**B.     Commerce Adequately Considered the Role of KPX on Remand**

In POSCO IV, the Federal Circuit held that Commerce's cost-recovery analysis "does not

support its conclusion that electricity prices paid to KEPCO by respondents are consistent with

prevailing market conditions because Commerce failed to evaluate KPX's impact on the Korean

electricity market."   977 F.3d at 1376.   The court noted that "evidence in the record suggests that

KPX has a significant impact on KEPCO's pricing," and that Commerce's failure to "adequately

investigate" KPX's influence, including its failure to "request information regarding KPX's cost

of electricity generation," constituted a failure to satisfy its "affirmative duty to investigate any

appearance of subsidies related to the investigation that are discovered during an investigation."

Id. at 1377–78.   Finally, the court held that "Commerce's failure to treat KPX as an authority --

or, at a minimum, investigate whether it is an authority -- constitutes error as a matter of law." Id. at 1378.

On remand, Commerce clarifies first that it "explicitly requested information" on KPX in its initial questionnaire to the GOK. Second Remand Results at 5–6, 16. The questions Commerce posed to GOK addressed both pricing and generation cost, and required GOK to provide specific quantities with respect to the percentage of generation costs not covered (if any) and the adjusted coefficient reflected in KPX's electricity pricing during the POI. Id. at 16–17. Commerce explains that this information was requested to "confirm that electricity generation costs paid by KEPCO reflected the full cost to KPX of generating electricity, including an amount of investment return," id. at 17, and details in the remand results its analysis of KPX's cost recovery with respect to its listed unit price, id. at 42–43. Commerce further notes that its assessment that the "electricity prices established by KPX are consistent with prevailing market conditions" and therefore do not constitute a countervailable benefit is in line with its prior determinations in the 2017 administrative reviews of cold- and hot-rolled steel from Korea. Issues and Decision Mem. accompanying Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2017, 85 Fed. Reg. 38,361 (June 26, 2020) at Cmt. 1 ("Cold-Rolled Steel AR IDM"); Issues and Decision Mem. accompanying Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2017, 85 Fed. Reg. 64,122 (Oct. 9, 2020) at Cmt. 1.

Nucor argues that Commerce's analysis of KPX's electricity pricing and cost recovery on remand fails to comply with the court's ruling in POSCO IV. First, Nucor claims that "the [Second Remand Results] include no additional information or analysis confirming whether the KPX pricing mechanism requests the actual costs of generating and supplying electricity" and thus

Commerce again fails to "adequately investigate[] Korea's prevailing market condition for electricity." Nucor's Br. at 14. Nucor next argues that Commerce again fails to examine KPX's "role in [KEPCO's] price-setting process," and any attempt to do so in the Second Remand Results conflates an investigation of KPX's pricing of electricity with upstream subsidy investigations. Id. at 16. Accordingly, Nucor contends, Commerce fails to treat KPX as part of the relevant authority under investigation as required by POSCO IV. Id. at 14.

The court concludes Commerce's Second Remand Results adequately address the Federal Circuit's decision in POSCO IV. In response to the Federal Circuit's finding of "error as a matter of law" with respect to Commerce's "failure to treat KPX as an authority . . . or, at a minimum, investigate whether it is an authority" 977 F.3d at 1378, Commerce acknowledges on remand that "the record evidence demonstrate[s] that KPX would be defined as an authority under [19 U.S.C. § 1677(5)(B)]," Second Remand Results at 7. Commerce explains that while KPX does constitute an authority,[3] the "information on the record . . . demonstrate[s] that there was no benefit in the pricing of electricity between KPX and KEPCO" and Commerce therefore declined to consider the purchase of electricity from KPX a discovered subsidy within the meaning of 19 U.S.C. § 1677d and § 1677(5)(B). In other words, Commerce determined that while Commerce is "an authority" as provided in 19 U.S.C. § 1677(5)(B) -- encompassing "a government of a country or any public entity within the territory of the country" -- and was treated as such, it nevertheless fails to confer "a benefit" such that it constitutes a subsidy under that section.

---

[3] Commerce reasonably rejects Nucor's allegation that KPX and KEPCO are the same authority, noting that "merging KEPCO and KPX as the identical 'authority' would make for an unusual subsidy allegation because, in essence, the allegation would be that the authority defined within [19 U.S.C. § 1677(5)(B)] is subsidizing itself, since KPX is wholly owned by KEPCO." Second Remand Results at 42 n.161.

Commerce further directly addresses the Federal Circuit's holding that it failed to "adequately investigate" KPX's influence, and to "request information regarding KPX's cost of electricity generation." POSCO IV, 977 F.3d at 1377–78. As noted above, the Second Remand Results explain that Commerce weighed the Won/kWh unit price of KPX's electricity sales against the Won/kWh cost of generation, and concluded that the "unit price more than covered the full costs." Second Remand Results at 42–43. KPX's own revenue, pursuant to its financial statements, "more than cover[s] its operating expenses," yielding both cost recovery and a return on investment. Id. at 43. Commerce further notes that its profitability analysis in this case aligns with its prior "investigations of the pricing of electricity between KPX and KEPCO" in the 2017 administrative reviews of cold- and hot-rolled steel from Korea. Id. at 44.

The court concludes that Commerce was not obligated to investigate KPX's underlying generation costs beyond the analysis set out in the Second Remand Results because the information it received in response to its initial questions reasonably indicated that KPX's pricing of generated electricity could not have constituted a subsidy under the statute. As Commerce notes, "Nucor did not include KPX as part of its LTAR allegation," and therefore "cannot circumvent the statutory requirement to properly allege a countervailable subsidy" by requesting that Commerce further investigate a program which it has determined, after review of the record, does not constitute a countervailable subsidy. Id. at 45–46. The "affirmative duty to investigate any appearance of subsidies . . . discovered during an investigation" identified by the Federal Circuit does not oblige Commerce to likewise investigate in detail even programs for which it determines there is no evidence of subsidization. POSCO IV, 977 F.3d at 1378. To suggest otherwise is to discount the role of the expert factfinder, and risks asking the court "substitute its judgment for that of the agency." Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc., 419 U.S. 281, 286 (1974).

As to Nucor's argument that Commerce conflates a potential upstream subsidy analysis with the investigation of KPX's generation costs, the court concludes that the argument lacks merit. As the Government explains in its reply comments, "Commerce referenced [the 2017 administrative review of cold-rolled steel] because, in the review of the same countervailing duty that resulted in the affirmative final determination [here], Commerce had 'investigated and verified the pricing structure between KPX and KEPCO' including KPX's methodology used to forecast demand, KPX's methodology to set the system marginal price, the electricity generator's reporting requirements to establish variable and fixed costs, and the underlying methodology to determine the electricity generator's rates of return and the adjusted coefficient." Def.'s Br. at 16 (citing Second Remand Results at 45, n.175); Cold-Rolled Steel AR IDM at 19. This analysis clearly constitutes an investigation of KPX's underlying pricing structure and generation costs in response to allegations that "KPX's price setting mechanism is not consistent with market principles," and does not conflate Commerce's upstream subsidy analysis in the 2017 review. Id., cf. id. at 17–18.

Accordingly, upon review of the Second Remand Results, the court concludes that Commerce's investigation of KPX on remand complies with the Federal Circuit's decision in POSCO IV and is supported by substantial evidence.[4]

---

[4] Nucor also argues in its comments on the Second Remand Results that Commerce's analysis only considers the costs of generation and supply "with respect to KEPCO in the aggregate" rather than with respect to KPX specifically. Nucor's Br. at 18. As the Government explains, the data assessed by Commerce set out "both KEPCO's and KPX's profitability during the [POI]," Def.'s Br. at 15, and indeed Commerce states that "each KEPCO generation subsidiary was profitable . . . and moreover, all six companies were so profitable that they paid out cash dividends," Second Remand Results at 43. That Commerce examined KPX both individually and within the broader scheme of the financial reporting of each -- a singular pronoun, indicating assessment of each individually -- generation subsidiary does not suggest that Commerce only considered KEPCO's aggregate data. The court thus rejects Nucor's argument.

## CONCLUSION

For the reasons stated, the court sustains Commerce's <u>Second Remand Results</u>.  Judgment will enter accordingly in favor of Defendant.

/s/     <u>*Gary S. Katzmann*</u>
Judge

Dated: <u>January 13, 2022</u>
      New York, New York